United States District Court
For the Northern District of California

1

2          IN THE UNITED STATES DISTRICT COURT

3          FOR THE NORTHERN DISTRICT OF CALIFORNIA

4

5

6   INTERNATIONAL BROTHERHOOD
    OF TEAMSTERS,

7                                          NO. C05-0126 TEH
                   Plaintiff,
8                                          ORDER DENYING
          v.                               PLAINTIFF'S MOTION FOR
9                                          PRELIMINARY INJUNCTIVE
    NORTH AMERICAN AIRLINES,               RELIEF
10
                   Defendant.
11

12

13          This matter came before the Court on July 27 and 28, 2005, for an evidentiary hearing

14   on a motion for preliminary injunctive relief filed by Plaintiff International Brotherhood of

15   Teamsters ("IBT").  The Court has carefully considered the record in this case, as well as the

16   parties' motion papers, post-hearing briefs, and proposed findings of fact and conclusions of

17   law.  For the reasons discussed below, the Court hereby DENIES the IBT's motion.

18

19   **BACKGROUND**

20          Defendant North American Airlines ("North American") is a Delaware corporation

21   with its principal place of business at JFK International Airport in Jamaica Queens, New

22   York, and a secondary base of operations at Oakland International Airport in Oakland,

23   California.  The company is certified to conduct passenger flights, internationally scheduled

24   and charter service, domestically scheduled and charter service, and supplementary

25   operations under the Federal Aviation Act.  It is undisputed that the company is a carrier

26   subject to the provisions of the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 et seq.

27          North American employs approximately 600 employees, including approximately 120

28   pilots.  Prior to 2004, North American's pilots were not represented by any union.  In January

2004, the National Mediation Board certified the IBT to represent North American's pilots during collective bargaining.

The parties have been engaged in collective bargaining since April 2004 and have had several series of negotiation sessions, including six sessions covering fourteen days in 2004. Although the parties had reached agreement on various sentences and paragraphs in the agreement, the IBT requested the assistance of the National Mediation Board on December 10, 2004. The parties first met with the assigned mediator in January 2005. At present, the parties have yet to agree to or execute a collective bargaining agreement, and they did not agree on an entire section of the agreement until July 2005. However, the parties remain actively engaged in mediation, having already met for several multi-day sessions in 2005. Two five-day sessions are also scheduled for September 2005.

On November 5, 2004, North American notified all of its employees that the company believed it had to cut costs to remain competitive in the industry. The announced changes, which were to become effective on January 1, 2005, included plans to require all employees to pay a portion of their health insurance premiums, a "restructuring of work rules and compensation of all flight crews to increase productivity," and a reduction in senior management salaries, including those of the CEO and COO. Pl.'s Ex. 2 at 4. The November 5, 2004 memorandum also announced that North American had developed revised pilot scheduling guidelines "designed to increase productivity and reduce our hourly costs. While there may be a reduction in take home pay, the majority of our cost savings is designed to come through productivity gains. The hourly wage scale will not be changed, but there will be no longevity increases." *Id.* The parties discussed these proposed changes, including the proposed revisions to the pilot scheduling guidelines, during their negotiation sessions in November and December 2004. North American asserted that it had the right to implement these changes unilaterally, but it was willing to discuss them with the IBT and listen to the IBT's suggestions.

After the IBT and North American failed to reach agreement on the proposed revisions to the scheduling guidelines, the airline decided to change course and attempt to

United States District Court

For the Northern District of California

1   achieve the desired cost savings through other means.  The company announced these

2   changes in a memorandum circulated to all employees on December 28, 2004.  The

3   announced changes included an eight-percent wage reduction and the elimination of

4   longevity increases for pilots, both effective on January 1, 2005.  Pl.'s Ex. 9 at 2.  The

5   changes also included a reduction in pilots' minimum monthly guarantee from 67 to 60 hours

6   and a reduction in their overtime pay rate, both effective on February 1, 2005.  *Id.*

7       The IBT filed this action on January 7, 2005, after the first of North American's

8   unilateral changes took effect.  The IBT contends that the implementation of these changes

9   violated North American's obligations under the RLA.  Among other relief, the IBT seeks an

10  order from this Court requiring North American to rescind the changes that the company

11  implemented without reaching agreement with the IBT.  The IBT further seeks an injunction

12  requiring North American to continue to engage in negotiations with its pilots under the

13  RLA, and under the auspices of the National Mediation Board, without unilaterally

14  implementing any changes to the terms and conditions of pilots' employment.  In addition to

15  injunctive relief, the IBT also seeks lost wages and benefits, including interest, and costs.

16      The IBT originally noticed its motion for preliminary injunctive relief for hearing on

17  February 28, 2005.  However, the Court delayed hearing the motion until after the Court

18  resolved North American's motion to dismiss or transfer, in which the airline argued that this

19  case should be dismissed in favor of an earlier-filed declaratory judgment action in the

20  Southern District of New York.  Judge Kenneth Karas dismissed the New York declaratory

21  judgment action on March 20, 2005.  On April 20, 2005, this Court denied North American's

22  motion to dismiss or transfer this case and set the hearing on the IBT's preliminary injunction

23  motion for May 23, 2005.  The parties unexpectedly notified the Court on May 11, 2005, that

24  they intended to present up to seven hours of live testimony at the motion hearing.  The

25  May 23 hearing was scheduled on the Court's regular law and motion calendar, and July 27

26  and 28 were the first dates available to both parties and the Court for a seven-hour

27  evidentiary hearing.

28

**United States District Court**
For the Northern District of California

1    **DISCUSSION**

2    **I.     Legal Standard**

3          To obtain a preliminary injunction, a party must generally "show either a likelihood of

4    success on the merits and the possibility of irreparable injury, or that serious questions going

5    to the merits were raised and the balance of hardships tips sharply in its favor." *Johnson*

6    *Controls, Inc. v. Phoenix Control Systems, Inc.*, 886 F.2d 1173, 1174 (9th Cir. 1989).  "These

7    two alternatives represent 'extremes of a single continuum,' rather than two separate tests."

8    *Clear Channel Outdoor Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)

9    (citation omitted).  Thus, a party showing a greater relative hardship need not show as high a

10   probability of success on the merits to obtain preliminary injunctive relief.  *Id.*

11         In this case, the IBT never argues that the balance of hardships tips sharply in its

12   favor, nor, aside from the complaint, does the union assert irreparable injury.  Instead,

13   throughout its papers, the IBT focuses on the first prong of the traditional test for preliminary

14   injunctive relief and argues that, as long as the union has demonstrated a violation of the

15   RLA, it is entitled to injunctive relief without regard to whether it has demonstrated any

16   irreparable harm.  The Supreme Court has observed that "district courts have subject-matter

17   jurisdiction to enjoin a violation of the status quo pending completion of the required

18   procedures [under the RLA], without the customary showing of irreparable injury." *Consol.*

19   *Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 303 (1989).  However, that case did

20   not discuss the standard for granting preliminary injunctive relief.  *Cf. Local 553, Transp.*

21   *Workers Union of Am. v. Eastern Air Lines, Inc.*, 695 F.2d 668, 677 (2d Cir. 1983) (noting

22   that, even though some question exists over whether irreparable harm is necessary to enjoin a

23   carrier in a major dispute, "there is no doubt that a finding of irreparable harm was

24   necessary" where the district court was ordering preliminary rather than final injunctive

25   relief).  In addition, the circuit courts disagree over whether the Supreme Court's statement

26   in *Conrail* was dicta because the case ultimately held that the dispute at issue was a "minor"

27   dispute not subject to the status quo provisions of the RLA.  *Air Line Pilots Ass'n, Int'l v.*

28   *Guilford Transp. Indus., Inc.*, 399 F.3d 89, 95-96 (1st Cir. 2005) (observing that the Supreme

United States District Court
For the Northern District of California

4

United States District Court

For the Northern District of California

1    Court's statement in *Conrail* was dicta, but noting that the Eighth and Eleventh Circuits both

2    "have given full allegiance to this dictum").  This Court need not resolve whether a showing

3    of irreparable injury is necessary for preliminary injunctive relief under the RLA because, for

4    the reasons discussed below, the Court finds that the IBT has failed to show any probability

5    of success on the merits of either of its two claims.

6

7    **II.      The IBT's Claim Under Section 2, First**

8         The IBT's first claim is that North American violated § 2, First of the RLA.  Under

9    that section, North American has a "duty . . . to exert every reasonable effort to make and

10   maintain agreements concerning rates of pay, rules, and working conditions."  45 U.S.C.

11   § 152, First.  North American also has a duty "to settle all disputes, whether arising out of the

12   application of such agreements or otherwise, in order to avoid any interruption to commerce

13   or to the operation of any carrier growing out of any dispute between the carrier and the

14   employees thereof."  *Id.*  This Court has jurisdiction to enforce § 2, First of the RLA.

15   *Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 581 (1971) (finding the

16   "conclusion inescapable that Congress intended the enforcement of § 2 First to be overseen

17   by appropriate judicial means").

18        The Supreme Court has explained that § 2, First contains an "implicit status quo

19   requirement."  *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142,

20   151 (1969) [hereinafter "*Shore Line*"].  The Court further explained that §§ 5, 6, and 10 of

21   the RLA, "together with § 2 First, form an integrated, harmonious scheme for preserving the

22   status quo from the beginning of the major dispute through the final 30-day 'cooling-off'

23   period."[1]  *Id.* at 152.  Section 6 provides that "'rates of pay, rules, or working conditions shall

24   not be altered' during the period from the first notice of a proposed change in agreements up

25   to and through any proceedings before the National Mediation Board."  *Id.* at 150 (quoting

26   45 U.S.C. § 156).  Section 5, First provides that "for 30 days following the closing of

27   ────────────────────

28        [1]Although North American disputes the applicability of the status quo requirements,
     the parties agree that this case presents a "major dispute."

United States District Court

For the Northern District of California

1   Mediation Board proceedings, 'no change shall be made in the rates of pay, rules, or working

2   conditions or established practices in effect prior to the time the dispute arose,' unless the

3   parties agree to arbitration or a Presidential Emergency Board is created during the 30 days."

4   *Id.* (quoting 45 U.S.C. § 155, First).  Finally, § 10 provides that "after the creation of an

5   Emergency Board and for 30 days after the Board has made its report to the President, 'no

6   change, except by agreement, shall be made by the parties to the controversy in the

7   conditions out of which the dispute arose.'" *Id.* (quoting 45 U.S.C. § 160).  Only § 2, First

8   and § 6 are potentially applicable to this case because the National Mediation Board

9   proceedings have not been closed in this case, and §§ 5 and 10 apply only after such

10  proceedings have closed and, in the case of § 10, after the creation of a Presidential

11  Emergency Board.

12          The parties' dispute in this case centers around when the status quo provisions in § 2,

13  First and § 6 take effect.  In particular, the parties disagree over whether the Supreme Court's

14  decision in *Williams v. Jacksonville Terminal Co.*, 315 U.S. 386 (1942) applies to this case,

15  or whether *Williams* was so limited by the Supreme Court's subsequent decision in *Shore*

16  *Line* that it does not apply where, as here, negotiations for a first collective bargaining

17  agreement have begun.  In *Williams*, the Supreme Court considered a case where Dallas red

18  caps had a certified union representative but, prior to the initiation of negotiations for the red

19  caps' first collective bargaining agreement, the employer made unilateral changes in the way

20  in which red caps handled tips.  Relying "particularly [on] section 2, First," the red caps

21  argued that the RLA prohibited such changes.  *Id.* at 402.  The Supreme Court rejected the

22  red caps' argument:

23              Because the carrier was, by the act, placed under the duty to exert
                every effort to make collective agreements, it does not follow that
24              pending those negotiations, where no collective bargaining
                agreements are or have been in effect, the carrier cannot exercise its
25              authority to arrange its business relations with its employees in the
                manner shown in this record [i.e., unilaterally].
26

27  *Id.*  This conclusion followed the Court's observation that the language of section 6 of the

28  RLA "is phrased so as to leave no doubt that only agreements, reached after collective

6

bargaining were covered." *Id.* at 400.  That is, the RLA "deal[s] with collective bargaining agreements only and not with the employment of individuals." *Id.* at 402.  As a result, "[t]he institution of negotiations for collective bargaining does not change the authority of the carrier.  The prohibitions of section 6 against change of wages or conditions pending bargaining . . . are aimed at preventing changes in conditions previously fixed by collective bargaining agreements." *Id.* at 402-03.

In *Shore Line*, the carrier argued that the status quo provisions of the RLA only required it to preserve the working conditions covered in the parties' existing collective bargaining agreement, and that it could make unilateral changes to working conditions not covered by the agreement.  The Supreme Court disagreed, holding that, as long as a collective bargaining agreement exists, the carrier has an obligation to maintain all "actual, objective working conditions out of which the dispute arose" during a major dispute, even if those conditions are not covered in the agreement.  *Shore Line*, 396 U.S. at 153-54.  Based on this ruling, the Court did not consider whether the carrier violated a duty to bargain in good faith.  *Id.* at 155 n.23.

The Court in *Shore Line* found *Williams* to be "inapposite" because *Williams* "involved only the question of whether the status quo requirement of § 6 applied at all.  The Court in *Williams* therefore never reached the question of the scope of the status quo requirement in a dispute, such as the one before the Court today, to which that requirement concededly applies." *Id.* at 157-58.  The *Shore Line* court further distinguished *Williams* by explaining that, "[i]n *Williams* there was absolutely no prior history of any collective bargaining or agreement between the parties on any matter." *Id.* at 158.  The IBT focuses on this last sentence to assert that the Supreme Court has limited *Williams* to situations where no collective bargaining agreement exists and where negotiations for a first collective bargaining agreement have not begun.

The Ninth Circuit considered *Williams* in *Regional Airline Pilots Association v. Wings West Airlines, Inc.*, 915 F.2d 1399 (9th Cir. 1990) [hereinafter "*Wings West*"].  However, the court did not address the potentially limiting language of *Shore Line* because the facts of that

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

1    case fell squarely under *Williams*; Wings West unilaterally changed working conditions

2    "immediately after the union's certification as representative of the airline's employees but

3    before the collective bargaining process had begun." *Id.* at 1400.  The Ninth Circuit held that

4    in such a situation, "where there has been no negotiation process instituted at all," a court

5    lacks authority to enjoin unilateral changes. *Id.* at 1403.  The Ninth Circuit has not addressed

6    whether the RLA imposes status quo requirements in cases such as this one, where a union

7    has been certified, collective bargaining has commenced, but no collective bargaining

8    agreement has been reached.

9            The Second and Eleventh Circuits, the only two appellate courts to have squarely

10   addressed this issue, have reached conflicting decisions.  The Eleventh Circuit has concluded

11   that "§ 2 First's duty to bargain in good faith, standing alone, precludes unilateral changes

12   after negotiations have commenced."  *Int'l Ass'n of Machinists v. Transportes Aereos*

13   *Mercantiles Pan Americandos, S.A.*, 924 F.2d 1005, 1008 (11th Cir. 1991) [hereinafter

14   "*Tampa Airlines*"].  In that case, the fleet service employees of Tampa Airlines first elected

15   the Teamsters Union as its exclusive bargaining representative and then elected the

16   International Association of Machinists and Aerospace Workers ("IAM") to succeed the

17   Teamsters.  *Id.* at 1006.  Before IAM was elected as the Teamsters' successor, the Teamsters

18   and the airline had reached a "tentative agreement regarding rates of pay, rules, and working

19   conditions.  Although that agreement was never finalized or ratified, Tampa Airlines

20   informed IAM, at the . . . commencement of bargaining between IAM and Tampa Airlines,

21   that such agreement contained the existing rates of pay, rules, and working conditions, *i.e.*,

22   the status quo." *Id.*  The court held that, because these facts demonstrated a prior history of

23   collective bargaining, the case "does not fall within *Williams*' small window of remaining

24   vitality." *Id.* at 1008-09.  The court explained that *Shore Line* "limited *Williams*' allowance

25   of unilateral changes to the narrow situation where there is 'absolutely no prior history of any

26   collective bargaining or agreement between the parties on any matter.'" *Id.* at 1008 (citing

27   *Shore Line*, 396 U.S. at 158).

28

United States District Court

For the Northern District of California

The Second Circuit, by contrast, has unequivocally held that "[a] newly certified union that has no collective bargaining agreement with the carrier is not entitled to a status quo freeze under the Act." *Aircraft Mechanics Fraternal Ass'n v. Atlantic Coast Airlines, Inc.*, 55 F.3d 90, 94 (2d Cir. 1995) [hereinafter "*Atlantic Coast*"]. In that case, the union and airline began contract negotiations, but the union declared an impasse several months later and sought assistance from the National Mediation Board. *Id.* at 92. It is unclear whether the parties in *Atlantic Coast* reached agreement on some but not all issues before the union sought such assistance. However, it is clear that the carrier made unilateral changes to certain terms of employment before any collective bargaining agreement was in place and before any mediation sessions were held. *Id.* The Second Circuit found no duty to maintain the status quo under § 2, First because the duty to bargain in good faith "does not require that [a carrier] refrain from exercising 'its authority to arrange its business relations with its employees' where no collective bargaining agreement is in effect," and, "aside from the disputed unilateral changes, the Union does not contend that the Airline has bargained in bad faith." *Id.* at 93 (citing *Williams*, 315 U.S. at 402). The Second Circuit distinguished *Tampa Airlines* on its facts – i.e., the existence of the tentative agreement, and the airline's announcement to the successor union that the tentative agreement represented the existing rats of pay, rules and working conditions – and explained that "[w]ithout deciding how we would hold in like circumstances, we note only that the specific facts supporting the Eleventh Circuit's decision in [*Tampa Airlines*] are absent in the present case." *Atlantic Coast*, 55 F.3d at 93-94.

A district court in the Northern District of Illinois followed the Eleventh Circuit's decision in *Tampa Airlines* when it considered a case where the union and carrier "reached tentative agreement on several, but not all, provisions" in negotiating a first collective bargaining agreement. *United Transp. Union v. Wisconsin Central Ltd.*, No. 98 C 3936, 1999 WL 261714, at *1 (N.D. Ill. Apr. 15, 1999) [hereinafter "*Wisconsin Central*"]. Relying on *Tampa Airlines*, the court held that the union "alleged the commencement of collective bargaining, thus triggering the good faith requirement of Section 2, First." *Id.* at *3. It is

unclear from the court's opinion the extent to which the parties reached tentative agreement – e.g., whether the parties agreed only on minor provisions, or whether they reached agreement on several major sections of the agreement.

In this case, Eugene Sowell, the IBT's principal spokesperson in negotiations with North American, testified that each contract has approximately twenty-nine sections, give or take two or three.  Tr. 33:11-20.  Once the parties have reached agreement on a section, it is "close[d] out" by initialing.  *Id.*  That section is then "considered a tentative agreement, subject, of course, to agreement of the whole document ratification by the pilots."  *Id.*  At the time of the unilateral changes in this case, the parties had agreed on "certain paragraphs . . . or [a] sentence here and there in different sections," but the parties "had not negotiated or closed out any complete section of the agreement at all."  *Id.*  Indeed, it was not until July 2005 that the parties reached tentative agreement and signed off on an entire section of the agreement.  *Id.* at 65:13-20.  Thus, by the definition provided by Mr. Sowell, in which an entire section must be closed out before a "tentative agreement" is established, no tentative agreement had been reached in this case at the time of the unilateral changes.

Thus, like the Second Circuit in *Atlantic Coast*, this Court finds the situation analyzed by the Eleventh Circuit in *Tampa Airlines* to be distinguishable from the facts before it.  Unlike the fleet services employees at Tampa Airlines, the pilots represented by the IBT have never reached a full tentative agreement with North American – nor, at the time the contested changes took effect, had the pilots even reached tentative agreement on any single section of a collective bargaining agreement.  Similarly, unlike Tampa Airlines, North American has never held up any tentative agreement as the existing rates of pay, rules, and working conditions.  The Court therefore finds no reason to follow the Eleventh Circuit's decision in *Tampa Airlines* and reject the Second Circuit's decision in *Atlantic Coast* – a case decided on essentially the same material facts as the case before this Court.  In *Atlantic Coast*, as here, the parties had begun negotiations, with one side seeking the assistance of the National Mediation Board.  Likewise, as was the case in *Atlantic Coast*, the union here does not contend that the airline has bargained in bad faith aside from the disputed unilateral changes.

10

United States District Court

For the Northern District of California

1   Even though the IBT argues that the pace of negotiations is slow, there is evidence that

2   airline contract negotiations in general take several years to complete, and the IBT has

3   produced no evidence that the airline is simply going through the motions of attending

4   mediation sessions with no desire to reach agreement.

5          The Court also does not find the single sentence from *Shore Line* relied on by the IBT

6   to be persuasive evidence that the Supreme Court has narrowed the application of *Williams*

7   solely to cases in which collective bargaining has not commenced.  Although the Court

8   described *Williams* as a case in which there was "absolutely no prior history of any collective

9   bargaining or agreement between the parties on any matter," this appears to have been a

10  factual distinction, rather than a holding that any collective bargaining, however minimal,

11  would remove a case from the interpretation of the RLA established by *Williams*.  *Shore*

12  *Line*, 396 U.S. at 158.  In fact, the Court in *Shore Line* had no reason to re-visit the key

13  question in *Williams* of "whether the status quo requirement of § 6 applied" because that

14  requirement "concededly applie[d]" in the *Shore Line* case.  *Id.*  The *Shore Line* court's

15  holding that the status quo provisions, when they apply, extend to all actual working

16  conditions even if those conditions are not expressed in a collective bargaining agreement,

17  says nothing about when the status quo provisions apply.  As the D.C. Circuit noted,

18              the *Williams* case holding, though weakened, is not dead.  None of
19              the Supreme Court cases cited above [including *Shore Line*] and no
                other case, before or since, has overruled *Williams*.  Thus, no power
20              to enjoin unilateral changes in working conditions by management
                flows from Section 6 of the Act in the absence of pre-existing, in
21              place, collective bargaining agreements.

22  *Int'l Ass'n of Machinists v. Trans World Airlines, Inc.*, 839 F.2d 809, 814 (D.C. Cir. 1988),

23  *amended on other grounds*, 848 F.2d 232 (D.C. Cir. 1988) [hereinafter "*TWA*"].  Thus, the

24  IBT is simply wrong when it argues that § 6 applies to cases where the services of the

25  National Mediation Board are invoked even if there is no pre-existing collective bargaining

26  agreement.[2]

27          [2]The IBT makes this argument for the first time in its post-hearing papers.  Prior to
28  that time, the IBT explicitly disclaimed reliance on § 6 when it wrote that "North American
    misapprehends the IBT's argument as charging the Carrier with violating the status quo

11

1    Nor is the IBT's request for an injunction saved by the union's reliance on § 2, First,

2    rather than § 6 of the RLA.  An injunction under § 2, First "may issue when such a remedy is

3    the only practical, effective means of enforcing the duty to exert every reasonable effort to

4    make and maintain agreements."  *Chicago & N.W. Ry.*, 402 at 583.  The Eleventh Circuit

5    found this test to be satisfied in *Tampa Airlines* because it concluded that the airline's firing

6    of numerous employees and making unilateral changes in working conditions "could only

7    serve to undermine the union members' confidence in IAM, their bargaining representative,

8    and to undermine the ability of IAM to bargain on a fair an equal basis with management."

9    *Tampa Airlines*, 924 F.2d at 1011.  Thus, the court determined that an injunction was "the

10   only practical and effective remedy" because "[a]ny collective bargaining agreement that

11   might result from further negotiations in the absence of an injunction would almost surely be

12   the product of decreased union bargaining strength."  *Id.*

13   However, in this case, there is no evidence that the unilateral changes have

14   undermined pilots' confidence in the IBT.  To the contrary, Mr. Sowell testified that he did

15   not know if the changes impaired the union's ability to act as the pilots' representative.  Tr. at

16   38:3-6.  He further testified that the changes may have led some pilots to question why they

17   joined the union, but they may also have led to increased solidarity; he "couldn't evaluate

18   either way."  *Id.* at 38:7-18.  Moreover, as the Eleventh Circuit noted in its opinion, the Ninth

19   Circuit has interpreted the standard for injunctive relief under § 2, First more narrowly:

20   "Both [the D.C. Circuit's opinion in *TWA*] and the Ninth Circuit's opinion in [*Wings West*]

21   contain language which might be interpreted as supporting Tampa Airlines' position that an

22   injunction cannot issue until all RLA procedures have been exhausted."  *Id.* at 1010.  In

23   *Wings West*, the Ninth Circuit cited the D.C. Circuit's *TWA* decision with approval, explicitly

24   noting that the *TWA* court "point[ed] out that in *Chicago & N.W. Ry.* all of the procedures for

25   negotiations, mediation, and the period for cooling off had been attempted and failed, and a

26   strike was imminent before resort was had to the injunctive measure."  *Wings West*, 915 F.2d

27   at 1403.  The Ninth Circuit continued by noting that, "[h]ere, as in the D.C. Circuit case, no

28   requirement of Section 6 of the RLA."  Reply at 1.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    steps toward bargaining, mediation, or the other steps provided in the Act to assist the

2    bargaining process had been undertaken," and "the prerequisites for stating a claim under the

3    authority of *Chicago & N.W. Ry.* do not exist under the facts of this case where there has

4    been no negotiation process instituted at all." *Id.*

5        Although the parties in this case had begun the bargaining process at the time of the

6    unilateral changes, the reasoning of the *Wings West* and *TWA* courts applies no less

7    forcefully where, as here, the parties are continuing to negotiate under the auspices of the

8    National Mediation Board. Beginning the bargaining and mediation processes is far from

9    terminating mediation without having reached agreement. In this case, the parties continue

10    to negotiate, with no evidence that either side is not participating in good faith with the desire

11    to reach agreement and no indication that the mediation will not ultimately be successful. A

12    court should interfere with the bargaining process "only in rare occasions," and "courts

13    should hesitate to fix upon the injunctive remedy for breaches of duty owing under the labor

14    laws unless that remedy alone can effectively guard the plaintiff's right." *Chicago & N.W.*

15    *Ry.*, 402 U.S. at 582; *Wings West*, 915 F.2d at 1403. Where negotiations are continuing, and

16    particularly where they are continuing with the assistance of the National Mediation Board,

17    this Court cannot say that an injunction is the only possible remedy to safeguard the union's

18    rights under § 2, First. As the Supreme Court held in *Williams*, the duty to exert every effort

19    to make collective agreements under § 2, First does not imply that "pending those

20    negotiations, where no collective bargaining agreements are or have been in effect, the

21    carrier cannot exercise its authority to arrange its business relations with its employees

22    [unilaterally]." *Williams*, 315 U.S. at 402. The parties do not dispute that North American

23    had the authority to institute unilateral changes after certification of the union but prior to the

24    beginning of negotiations, and the Supreme Court has held that "[t]he institution of

25    negotiations for collective bargaining does not change the authority of the carrier." *Id.*

26    Because the IBT has failed to present other evidence that the union refuses to negotiate or is

27    simply going through the motions with a desire not to reach agreement, this Court, like the

28    Second Circuit in *Atlantic Coast*, finds no authority to enforce the status quo under § 2, First

under the facts of this case. *Atlantic Coast*, 55 F.3d at 93; *see Chicago & N.W. Ry.*, 402 U.S. at 578-79 & n.11 (noting that strict compliance with the procedures of the RLA "is meaningless if one party goes through the motions with 'a desire not to reach an agreement,'" but explaining that "great circumspection should be used in going beyond cases involving 'desire not to reach an agreement,' for doing so risks infringement of the strong federal labor policy against governmental interference with the substantive terms of collective-bargaining agreements").

Finally, the IBT attempts to draw support for its § 2, First claim by analogizing to the National Labor Relations Act ("NLRA"). In a situation like the present one, where no prior collective bargaining agreement existed, the Supreme Court held that "an employer's unilateral change in conditions of employment under negotiation" is as much a violation of the NLRA's duty to bargain in good faith as a "flat refusal" to negotiate. *N.L.R.B. v. Katz*, 369 U.S. 736, 743 (1962). Although the NLRA and RLA are not coextensive, courts "may consult" NLRA cases for purposes of interpreting the RLA. *Ass'n of Flight Attendants v. Horizon Air Indus., Inc.*, 976 F.2d 541, 544 (9th Cir. 1992). In *Horizon Air*, the Ninth Circuit explained that the Supreme Court held that "the duty to 'exert every reasonable effort' imposed by the RLA requires *at least* 'the avoidance of "bad faith" as defined' under the NLRA, that is, 'go[ing] through the motions with "a desire not to reach an agreement."'" *Id.* (citing *Chicago & N.W. Ry.*, 402 U.S. at 578). However, this does not mean that the duty to exert every reasonable effort under the RLA is coextensive with the duty to avoid bad faith under the NLRA.

To the contrary, the Ninth Circuit explicitly declined to apply *Katz* to a case arising under the RLA. In *Wings West*, the court observed that, under *Katz*, "a unilateral change in working conditions by an employer before the bargaining process began would be an unfair labor practice to be remedied by the NLRB." *Wings West*, 915 F.2d at 1402 (citing *Katz*, 369 U.S. 736). The court then explained that "we must be careful in transposing concepts from the NLRA to its predecessor, the RLA," because "[i]t is doubtful that Congress intended the federal courts to operate [in RLA cases] as the NLRB does under the detailed statutory

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1 prescriptions of the NLRA." *Id.* Rather than importing *Katz*'s holding under the NLRA to

2 § 2, First of the RLA, the court rejected *Katz*'s application to the RLA and found that the

3 plaintiff failed to state a claim under the RLA because bargaining had not commenced. *Id.* at

4 1403. Thus, the fact that the NLRB would have had the authority to remedy unilateral

5 changes under the NLRA does not give this Court authority to remedy those changes under

6 the RLA. The IBT's position to the contrary is irreconcilable with the Ninth Circuit's

7 decision in *Wings West*.

8       In short, although bargaining had commenced in this case at the time North American

9 made the disputed unilateral changes, the Court nonetheless finds, for the reasons discussed

10 above, that the IBT has failed to demonstrate any probability of success on the merits of its

11 claim under § 2, First of the RLA. Accordingly, with good cause appearing, the Court

12 DENIES the union's request for injunctive relief on that claim.

13

14 **III.   The IBT's Claim Under Section 2, Fourth**

15       The IBT's second claim is for injunctive relief under § 2, Fourth of the RLA. That

16 section provides that, "no carrier, its officers, or agents shall deny or in any way question the

17 right of its employees to join, organize, or assist in organizing the labor organization of their

18 choice, and it shall be unlawful for any carrier to interfere in any way with the organization

19 of its employees." 45 U.S.C. § 152, Fourth.

20       North American does not dispute that it treated pilots differently from other

21 employees when it imposed changes in the terms and conditions of employment. However,

22 this is not sufficient to establish discriminatory intent. As the airline correctly argues, the

23 RLA does not outlaw discrimination in employment; instead, it only outlaws discrimination

24 that "interfere[s] in any way with the organization of its employees." *Id.* The question in

25 § 2, Fourth cases is therefore whether "the carrier has discriminated against employees

26 because they have engaged in activities protected by the RLA." *Atlas Air, Inc. v. Air Line*

27 *Pilots Ass'n*, 232 F.3d 218, 224 (D.C. Cir. 2000) (citation omitted).

28

United States District Court

For the Northern District of California

1   The IBT relies heavily on *Atlas Air*, a case in which the D.C. Circuit found a violation

2   of § 2, Fourth, but that case is readily distinguishable on its facts.  During the time in which

3   cockpit crewmembers were considering whether to unionize, Atlas Air "sent a letter to all

4   crewmembers explaining the potential consequences of unionization."  *Id.* at 221.  The letter

5   stated that, "One area that will change if a union is certified is profit sharing.  Our Profit

6   Sharing Plan says clearly that employees who have been certified by the National Mediation

7   Board are *not* eligible for profit-sharing. . . .  *If a union is certified, you instantly lose your*

8   *profit sharing*."  *Id.*  The letter further warned that "'loss of profit sharing could have a

9   significant financial impact on you and your family' and included a chart detailing the likely

10   impact of the plan's termination on the salaries earned by employees of varying levels of

11   seniority."  *Id.*  As warned in the letter, the airline terminated the profit-sharing plan for

12   cockpit crewmembers upon announcement that the union had won election, even though the

13   plan remained in effect for all non-union employees.  *Id.*  This action reduced union

14   members' compensation by over 25 percent.  *Id.*  The D.C. Circuit found that the airline's

15   actions violated § 2, Fourth because:

16   
> Atlas Air adopted a facially discriminatory policy that penalized
17   employees by terminating their participation in profit sharing for no
    other reason than their decision to unionize.  Prior to the election of
18   ALPA [the union] as the crewmembers' bargaining representative,
    Atlas repeatedly threatened its employees with a substantial decrease
19   in compensation that would have a real and material impact on the
    conditions of employment.  In case there was any confusion about the
20   magnitude of the loss that would result upon certification of a union,
    Atlas distributed documents detailing the amount of income at stake.
21   Then, upon learning of ALPA's election, Atlas immediately fulfilled
    its threat and terminated the profit-sharing plan before the results had
22   even been certified.  It is difficult to view these actions as anything
    other than the sort of "interference, influence, or coercion" explicitly
23   barred by the RLA.

24   *Id.* at 226.  The court further explained that anti-union animus may be presumed where a

25   unilateral change "having a real and material impact on the conditions of employment . . . is

26   justified on no other grounds than union certification."  *Id.* at 226.

27   In this case, by contrast, there is no such clear indication of anti-union animus.  There

28   is no evidence, for instance, of a facially discriminatory policy such as the one Atlas Air

adopted, in which unionized employees were specifically excluded from the airline's profit-sharing plan solely because they were members of a union.  Additionally, there is no evidence in this case of the type of coercive tactics employed by Atlas Air prior to certification.  Although the IBT presented testimony that North American's CEO, Dan McKinnon, circulated a pre-certification letter to pilots urging the pilots to oppose unionization, that letter reportedly focused only on the financial impact unionization might have on the company, not individual employees, and never threatened any action against pilots should they choose to unionize.  Tr. at 78:17-79:4.  Similarly, Mr. McKinnon's reported comments, at the start of negotiations, that he was disappointed that the pilots had elected to unionize are insufficient to establish that the company's decisions were motivated by anti-union animus.  *Int'l Bhd. of Teamsters v. World Airways, Inc.*, 111 L.R.R.M. (BNA) 270, 1982 WL 2109, at *4 (holding that evidence of "some possibly ill[-]advised statements by the Company's president early in the negotiating process" was not enough "to sustain plaintiff's burden of showing a probability of success" on the issue of whether the company was "attempting to undermine the Union's status as the representative of the Company's employees").

Moreover, the airline in this case made changes affecting all employees' compensation, not just that of pilots.  For example, starting in January 2005, all North American employees were, for the first time, required to pay 20% of their health insurance premiums.  Because these are fixed costs and not based on a percentage of employees' salaries, this change equates to a greater percentage reduction in take-home pay for employees with lower salaries, such as flight attendants and staff employees, than it does for pilots.  *See* Tr. at 117:14-20 (noting that the average salaries for flight attendants, staff employees, and pilots at North American are $25,000, $46,000, and $80,000, respectively).  Similarly, the company imposed an indefinite freeze on longevity increases on both flight attendants and pilots and a one-year freeze on merit-based increases for staff personnel.  In addition, the COO and CEO both took a 15% salary reduction, and other members of the company's senior management team took a 10% reduction in pay.  Although salaries were

17

1   not cut for staff personnel, the IBT has not refuted North American's testimony that the

2   company opted not to reduce staff pay because their salaries were already low when

3   compared with other airlines and with other companies in the same geographical area.

4       In short, the evidence in this case demonstrates a company-wide objective to reduce

5   costs, not a targeted effort to reduce pilots' compensation because they elected to unionize.

6   Thus, although the IBT makes much of a September 29, 2004 e-mail, Pl.'s Ex. 17 (filed

7   under seal), the Court does not find that e-mail to be evidence of anti-union bias given the

8   context of a company-wide cost-cutting plan.  There simply is no evidence that pilots were

9   singled out for reductions in pay, let alone that they were singled out because of their efforts

10  to unionize.  Similarly, because the question under § 2, Fourth is whether a carrier has

11  discriminated against employees for engaging in protected union activity, the reasons behind

12  the company's desire to cut costs across-the-board is not relevant to this Court's analysis.

13  The Court therefore need not analyze the company's financial situation or profitability, nor is

14  it the Court's role to second-guess North American's business decision that it needed to

15  reduce costs to remain competitive.

16      The IBT also argues that the disparate treatment between pilots and flight attendants is

17  sufficient to demonstrate a violation of § 2, Fourth, but this argument is unavailing for the

18  following reasons:  First, the IBT has failed to establish that the 2005 changes to North

19  American's compensation and scheduling policies had any greater impact on pilots than on

20  flight attendants.  To the contrary, the union has not disputed North American's claims that

21  the changes resulted in an approximate fourteen-percent reduction in costs of the flight

22  attendant payroll, whereas the changes resulted only in an eleven-percent reduction in costs of

23  the pilot payroll.[3]  While it is true that much of the reduction in flight attendant payroll came

24  from the company's decision not to fill flight attendant positions vacated by attrition, this

25  only underscores North American's assertion that it was able to cut costs in its flight

26  attendant payroll by increasing productivity rather than reducing wages.  The company's

---

27      [3]Steve Harfst, North American's COO, testified that the percentage reductions were

28  approximately twenty percent for flight attendants and ten percent for pilots, but the actual
    figures given by Harfst yield fourteen and eleven percent, respectively.  Tr. at 147:23-151:5.

stated goal for both pilots and flight attendants was to achieve cost reductions primarily through increased productivity. Because of the reductions achieved by the changes made to flight attendants' work rules, the company saw no need to further reduce the costs of the flight attendant payroll by cutting wages.

Although the November 5, 2004 memorandum did not explicitly state that North American would be meeting with the IBT to discuss changes in scheduling guidelines in the same way that North American stated it would meet with a group of flight attendants, the company nonetheless remained open to the union's suggestions on the revised changes to pilot scheduling guidelines. On November 5, 2004, for example, counsel for North American wrote a letter to union representatives explaining that the company "would be pleased to discuss at our meetings next week in San Francisco any questions or suggestions you might have concerning these matters [including the revised pilot scheduling guidelines], to the extent they relate to pilots." Pl.'s Ex. 3. Similarly, on November 11, 2004, counsel wrote that North American "is and continues to be amenable to discussing all aspects of the proposed changes with the union. Indeed we have now spent the better part of three days . . . doing just that, and we are willing to continue this process for as long as it may be productive." Pl.'s Ex. 5.

Unlike the company's discussions with the flight attendants, the company's discussions with the IBT were not productive. North American's COO testified that "at no time did [the union] express any interest or desire to cooperate or work with us or to communicate"; instead, they were "unreceptive" and "hostile" to the idea of revised scheduling guidelines. Tr. at125:11-23. The IBT representative's testimony does not refute this point and instead only emphasizes that the "problem" was that the airline felt it had the right to impose unilateral changes, so the union was invited to make suggestions only, but the airline would do "whatever they decided to do . . . no matter what [the union] said." *Id.* at 59:1-60:10. However, nothing indicates that pilots were treated any differently from flight attendants throughout this process. In both cases, North American sought to make cost reductions by increasing productivity through changes in working conditions such as

United States District Court

For the Northern District of California

1   scheduling guidelines.  In both cases, the airline expressed its willingness to meet with

2   employee representatives to discuss the proposed changes and listen to the employees'

3   suggestions.  The only difference is that the flight attendants were able to reach agreement

4   with North American, while the IBT could not.  When the IBT and North American failed to

5   agree on how to implement the proposed changes to the scheduling guidelines, the airline

6   instead opted to impose wage reductions to accomplish its cost-saving goals.  There is no

7   indication that the airline would not have done the same for flight attendants had that group

8   also failed to reach agreement on the changes to work rules, or that the airline would have

9   taken a different course had the pilots not been represented by a union.  Thus, the Court finds

10  that the imposition of wage reductions on pilots but not on flight attendants had nothing to do

11  with the pilots' decision to unionize; instead, it was the result of the inability of the pilots and

12  the airline to come to agreement on changes to working conditions that would have resulted

13  in the company's desired cost savings.

14      Based on all of the above, the Court finds that the IBT has failed to demonstrate any

15  probability of success on the merits of its claim that North American violated § 2, Fourth of

16  the RLA.  The IBT's motion for a preliminary injunction based on that claim is therefore

17  DENIED.

18

19  **CONCLUSION**

20      For the reasons discussed above, the Court finds that the IBT has failed to meet its

21  burden in seeking preliminary injunctive relief.  In particular, the union has failed to

22  demonstrate any likelihood of success on the merits of either its claim under § 2, First or § 2,

23  Fourth of the RLA.  Thus, even if the IBT is correct and no showing of irreparable harm is

24  necessary for preliminary injunctive relief under the RLA, this Court is without power to

25  enter a preliminary injunction.  Accordingly, with good cause appearing, the Court hereby

26  DENIES the IBT's motion for preliminary injunctive relief in its entirety.

27      IT IS FURTHER ORDERED that the parties shall appear before the Court for a case

28  management conference on **Monday, November 14, 2005, at 1:30 PM.**  They shall meet

20

and confer and file a joint case management statement no later than **Monday, November 7, 2005.**

**IT IS SO ORDERED.**

DATED ___09/14/05___

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28